UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JODY A. JESHURIN,<br><br>        Petitioner,<br><br>   v.<br><br>GLORIA HENRY, Warden,<br><br>        Respondent. | No. C - 03-1055 JSW (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Petitioner Jody A. Jeshurin, a prisoner of the State of California incarcerated at Valley State Prison for Women, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. This Court ordered Respondent to show cause why the petition should not be granted. Respondent filed an answer to the petition and a memorandum of points and authorities in support thereof. Petitioner has not filed a traverse. For the reasons stated below, the petition is denied on the merits.

## PROCEDURAL BACKGROUND

Petitioner was convicted of first degree murder on March 12, 2001, by a Santa Clara County jury. On May 11, 2001, she was sentenced to twenty-five years to life in state prison. The California Court of Appeal affirmed the judgment of conviction on September 27, 2002, and the Supreme Court of California denied review on December 22, 2002.

Petitioner commenced this action on March 11, 2003, and filed a habeas petition in this action on May 29, 2003. The petition asserted three claims, one of which–a claim for ineffective assistance of counsel–had not been exhausted in state court. On October 29, 2003, the Court granted Petitioner's request to stay the petition pending exhaustion of the ineffective assistance of counsel

claim, subject to the following conditions:

> If Petitioner wishes to have this court consider her ineffective assistance of counsel claim in an amended petition she must properly present these claims to the Supreme Court of California within thirty days of the date this order is filed, and thereafter file a first amended petition in this Court within thirty days of the California Supreme Court's decision. If Petitioner fails to do so, this matter shall proceed on Petitioner's petition regarding the claims which were previously exhausted and the Court will not consider Petitioner's other claim.

Order Staying Habeas Petition; Granting Leave to Amend and Instructions to Clerk ("Stay Order"), filed October 29, 2003.

Petitioner filed an amended habeas corpus petition with this Court, including the claim of ineffective assistance of counsel, on April 16, 2004. On April 5, 2006, the Court reopened the case and issued the order to show cause. Respondent filed an Answer in which it opposed the amended petition on the merits and brought to the Court's attention the fact that Petitioner did not, after the original petition was stayed, file a habeas petition in the California Supreme Court or the California Court of Appeal raising her ineffective assistance of counsel claim.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the factual background of the case as follows:

> Marie Fleck died on January 24, 2000, at age 83. Fleck had a Stanford University degree and had taught high school for many years. By 1997, Fleck was suffering from Alzheimer's disease and mobility problems. She lived at 1260 Emory Street in San Jose and had 24-hour live-in care paid for by the public guardian's office. At the end of 1997, the office hired Glenna Cleo Patrick and her nursing registry, Cleo's Care, to provide care for Fleck.
>
> Fleck was a difficult assignment. "Being independent," she often refused help and would lock caretakers out of her home or call the police to have them removed. After a series of failed assignments, Cleo's Care assigned An Thi Dao and Jan Ford to care for Fleck in November of 1998. Fleck liked Ford and Dao and got along with both of them.
>
> In April 1999, when Dao quit her assignment with Fleck and entered a rehabilitation program for her drug addiction, defendant took over Dao's position. Defendant and Ford were best friends, and Ford helped defendant obtain her job with Cleo's Care. Dao testified that Ford was addicted to heroin and used it every day, but Ford denied using drugs during the fall of 1999 and January of 2000. Initially, Ford worked 24-hour shifts Monday through Friday and defendant worked the weekend shift. At the end of the summer, they reversed roles, and defendant took over the weekday shift. Ford testified that, as a victim of Alzheimer's, Fleck was "totally dependent" upon Ford and defendant.

2

Dao continued to visit Fleck after leaving her job at Cleo's Care. She testified that Fleck was ambulatory and remained in good health and good spirits through the fall of 1999 but that, in January 2000, Fleck's health took a severe downturn; she lost approximately 30 pounds and became bedridden. When Dao asked about Fleck's condition, Ford said that Fleck had suffered a series of "mini strokes." It was only after Fleck died that Ford told Dao that Fleck's "decline was a direct result from a car accident" in which defendant had been driving while Fleck was not belted in and Fleck "was tossed around in the car." Ford told Dao that was what defendant had said.

Although the caretakers had been instructed to document dramatic changes in a patient's health, neither Ford nor defendant recorded Fleck's deteriorating condition or reported it to their supervisor or to Fleck's physician. Ford testified Fleck had declined in part as a result of having a cold or flu in January and that she already had bruises before the day of her death, bruises that had been caused from falling out of bed on numerous occasions and from falling in the bathroom in January. During the weekend of January 22 and 23, 2000, Ford did not hit Fleck, fall on her, kick her, drag her around, or in any way injure her. At the time Ford left Fleck with defendant on Sunday afternoon, Fleck did not appear to have any broken bones. Ford said her personality in dealing with Fleck was calm, reassuring, and giving while defendant's personality was "definitely" "more confrontational to get [Fleck] to do things." Ford testified that, while she would "baby" Fleck, defendant "would say, 'oh no Marie, I'm not going to do it for you. You're capable. You do it. Help yourself."

Between 6:00 and 8:00 p.m. on Sunday, January 23, 2000, defendant began her weekly shift. At the time, defendant was living in Fleck's house and had nowhere else to stay. At approximately 3:00 p.m. the following day, Monday, January 24, defendant called Ford at her home and asked Ford to come help her lift Fleck back into bed. Ford was tired and did not want to come back to work; she told defendant to cover Fleck with a blanket and put a pillow under her head. Ford noted that defendant could have called the owner of Cleo's Care if she needed further assistance. Over the next few hours, defendant called Ford several more times. In response to another call several hours later, Ford agreed to come over to assist defendant. She left her home at about 7:30 p.m. When Ford arrived after having caught an 8:23 p.m. bus, she found Fleck dead on the kitchen floor. Fleck's body was cold to the touch. Defendant told Ford that Fleck had been in the kitchen with her walker when she stiffened and fell, that Fleck had been dead for about 30 minutes, and that neither the police nor Cleo's Care had been called yet because defendant was "scared" and did not know what to do.

When police and paramedics arrived at 9:17 p.m., Fleck's body was "in rigor and was cold to the touch." Lividity was present at the lower parts of the body. There were "swipes" of blood which indicate "movement" as well as dripped blood on the kitchen cabinets and several bloodstained and blood soaked paper towels in the garbage pail that was on the kitchen counter. In an outside garbage can and in a nearby plastic bag, police found more bloody paper towels, a Depends, and a shirt with a torn collar and blood stains. The police also observed dried bloodstains on a number of areas on Fleck's body.

Paramedic Francis Ryan spoke with defendant, who reported that, approximately 30 minutes prior to the 911 call made at 9:15 p.m., she had been in another room when Fleck fell to the kitchen floor with a "thud." Defendant also told Ryan that Fleck had been falling a lot recently.

3

When Santa Clara County's Chief Coroner Gregory Schmunk first observed Fleck's body at 1:00 a.m. on January 25, 2000, Fleck's body was "cold to the touch" and "rigor was moderate." The coroner concluded Fleck would have been dead anywhere from six to twelve hours prior to the examination. The amount of lividity and rigor mortis observed by the paramedics at approximately 9:15 p.m. was consistent with death having occurred around 6:00 or 7:00 p.m. or earlier. Schmunk was certain Fleck "had been dead for some period of time" at the time the paramedics arrived. He concluded the cause of death was "multiple blunt force trauma," aggravated by Fleck's heart disease, chronic obstructive pulmonary disease, and lung disease. At the time of her death, Fleck was 62 inches tall and weighed 140 pounds. Schmunk testified the bruises "on virtually every surface of Ms. Fleck's body" were all "recent" and "contemporaneous" with Fleck's death; none of the bruises "stood out as being older" and none suggested traumatic injury suffered "three or four weeks prior to January 24th." He said Fleck had suffered a fractured sternum, seven fractured ribs on her right side, and nine fractured ribs on her left side. Schmunk concluded the fractures also were contemporaneous with Fleck's death and that the damage to the sternum would have required a significant amount of force. Schmunk described a 1/4 inch laceration to Fleck's liver which he felt was contemporaneous with the rib fractures, and he testified that "you need a substantial amount of force" to cause a laceration to the liver. Fleck also had a few large bumps on her head and ligature mark around her neck. While there was no evidence Fleck died of strangulation, Schmunk testified the ligature mark indicates that "a significant amount of force" was placed on the neck, which "is a very dangerous place to put force" because you could "[v]ery easily" strangle someone. Schmunk also observed on Fleck's body bruising in parallel lines consistent with "[v]ery hard pressure" from fingers and dot-shaped bruises that could have been caused by fingertips. The coroner noted that, while some of Fleck's injuries might be consistent with "extremely rough maneuvering" in an attempt to force a person to get up into a chair or back to bed, in this case, such attempts "certainly would not account for the injuries on the calves and the arms and the head." When defense counsel suggested Fleck could have gotten her injuries to her legs by someone "squeezing and lifting" the legs while trying to lift her, the coroner responded that squeezing and lifting the body or legs in the manner suggested by counsel "would be a mechanism that would be inherently dangerous and would be recognized as such by virtually anyone." He added that someone would have had to grasp Fleck's arms and legs very hard with significant force "on multiple occasions up and down the legs and up and down the arms" to cause the injuries in question and that such force would not have been necessary had Fleck been unconscious, as suggested by defense counsel. Schmunk said the type of laceration to the liver in this case was caused by pressure against the body surface rather than by a broken rib cutting the liver.

Schmunk said Fleck's injuries would have been painful and that a normal person would have screamed or cried out if conscious. He then added, "[I]f the person was unconscious, I think the injuries would have been less significant. My overall impression of these injuries was that the patient was resistant." Viewing the injuries in their totality, Schmunk concluded Fleck's death was caused by "a combination of all the injuries that were present," that it was "due to actions of another person," and that it was not accidental. He based this conclusion upon "the degree of injury as regards to the force, the number of injuries that were imparted to her, and the multiple locations on the body where the injuries were present."

The police repeatedly interviewed defendant following Fleck's death. On the night Fleck died, Officer Robert Magdaleno interviewed defendant at Fleck's home.

4

Defendant, who was not under arrest, told Magdaleno that Fleck had fallen "at least a dozen times" in the eight months defendant had cared for her but that her falls "were never that serious" to involve a doctor or hospital. With regard to the events leading up to Fleck's death, defendant said she had been feeding Fleck in the kitchen at noon when Fleck stood and then fell to the ground. Fleck's nose bled, and Fleck defecated on herself. Fleck said she was all right, and defendant cleaned her and changed her Depends. When Fleck defecated a second time, defendant cleaned and changed her again. However, defendant was unable to lift Fleck from the floor. Defendant said she regained her strength after about an hour and a half and then tried to lift Fleck again, but Fleck fell and hit her head on the dishwasher. When Fleck indicated she was all right, defendant got her a blanket and pillow. Defendant said she periodically checked on Fleck, who was bruised and "moaning." Defendant said she also repeatedly called Ford and her friend Martha for assistance and that she went outside several times to smoke and to look for someone to help her. Defendant said Fleck was alive up to 30 minutes before the paramedics came, that she discovered Fleck was dead when checking on Fleck five to ten minutes before Ford arrived, and that she had not known what to do so she waited for Ford to arrive. Defendant told Magdaleno that Fleck was "spoiled" and "used to getting her way." Defendant doubted Fleck actually needed help getting up and suggested Fleck "just wanted people to do things for her."

On January 25, 2000, defendant, who still was not under arrest, gave a taped interview at the police station. In that interview, defendant described the events leading up to Fleck's death as follows. Shortly before noon, defendant helped Fleck from the kitchen chair. Fleck defecated and then fell to the floor when defendant turned to put a plate in the sink. Fleck hit her head, which caused her nose to bleed, and defendant "could see that [Fleck] was gonna get black and blue." When defendant tried to pick Fleck up, Fleck fell again and said that she needed to rest. Defendant cleaned Fleck and removed her clothing, but Fleck defecated again. According to defendant, "it was like black tar everywhere." The floor was covered and Fleck was rolling in the excrement. Defendant then asked Fleck, "don't you know when you have to go to the bathroom[?]" She described Fleck as a spoiled "queen of the castle" and described the two of them as having a "love hate" relationship since defendant would not "baby" Fleck and made her "try and do for herself." While denying being angry at Fleck, defendant said the defecation situation "was just disgusting." After cleaning and dressing Fleck, defendant again tried to lift Fleck, but Fleck fell and "really clunked her head," which caused her nose to bleed again and her head to turn black and blue. After getting Fleck a pillow and blanket, defendant washed Fleck's bloodied clothes and sneakers. All day, defendant tried to lift Fleck, but she was "dead weight . . . . She didn't help me in any way." Defendant thought the ligature mark occurred when she pulled Fleck up by her blouse and the blouse caught around Fleck's neck and tore. At some point, when Fleck involuntarily bit defendant while defendant was trying to assist her, defendant thought she may have jerked accidentally and hit Fleck in the nose and aggravated the bleeding. When defendant tried to lift Fleck by her abdomen, Fleck slipped and dropped "like a rag doll." When defendant told Fleck to cooperate, Fleck moaned and said, "I can't." Fleck complained that defendant was hurting her, but defendant was convinced Fleck was all right. Defendant said. [sic] "[T]he one thing [defendant's] mother never wanted to hear was, I can't. It was always, I can." Defendant therefore told Fleck that she "should know better. You were a teacher . . . . If you say you can, you will . . . ." Defendant took several cigarette breaks and tried to call Ford and Martha for help. Approximately 15 minutes before Ford arrived, defendant noticed Fleck was not breathing. Ford arrived and confirmed that Fleck was dead. Ford called Glenna

5

Patrick, who told Ford to call 911.

During this taped interview, defendant said she was frustrated with Fleck because "she won't help me help her." Noting that she was not a "trained professional," defendant said she would have called 911 if she had "thought that there was something wrong." Defendant admitted she used illegal drugs and that she had used speed the weekend prior to Fleck's death.

Still not under arrest, defendant gave another taped interview on March 15, 2000. Defendant now said she thought Fleck was breathing up until the time Ford arrived at the house. When initially confronted with the results of the autopsy, defendant insisted she did not hit or kick Fleck and that she had not been upset with Fleck, but she could not explain how Fleck had sustained damage to her ribs, liver, and sternum. For the first time, defendant mentioned a New Year's Eve incident when she and Fleck were involved in an automobile accident. Defendant initially said she was driving while Fleck sat in the back when another care sideswiped her and that Fleck was tossed around and "got black and blue." Defendant later changed her statement, saying she had been able to swerve to avoid the other car. During this interview, defendant admitted having fallen on Fleck at least twice and having stepped on her "hard" at least three or four times while trying to lift her. Defendant added that her knee once fell "full force" on Fleck's chest and that she had grabbed Fleck "real tight" when she tried to pick her up. Defendant said it was "very frustrating" trying to help Fleck because she would not help herself and "always wanted things done for her." Defendant complained Fleck had gotten "so lazy" and used to being in bed that she "didn't even wanna tell you when she had to go to the bathroom." When Fleck would not help get herself off the floor, defendant became frustrated because she felt Fleck was being "lazy" and that "[i]t was a matter of . . . reconditioning her to not be lazy in that respect." Defendant said she "kept telling [Fleck], 'I can't do it all myself . . . . I need you to help me." [sic] Admitting she kicked Fleck once "in frustration" and perhaps a second time, defendant acknowledged it was "a terrible thing to do." She added, "I see people hurting elderly or children and it makes me sick. It's not right. But sometimes I can understand how you could just . . . You could just get to that point, you know?" Defendant said Fleck "never" cried out in pain or said anything to indicate she was hurting or in pain, even when defendant kicked her or fell on her. Defendant said Fleck was on the floor from noon until the police arrived at 9:00 p.m., and defendant admitted that Fleck possibly died "at six or seven." After initially denying she had applied makeup to Fleck's face, defendant admitted she did so because she did not want Fleck "to look bad."

Glenna Patrick testified on behalf of defendant. Patrick said Fleck had been a difficult client and had gone through at lease eight caretakers. Patrick visited Fleck's home at least twice a month to check on her. Patrick acknowledged there were no notations in Fleck's log that Fleck had lost weight or was bedridden and that she was unaware that any of her employees used drugs or that defendant was living in Fleck's home.

*People v. Jeshurin*, No. H023032, 2002 WL 31160557, at *1-4 (Cal. Ct. App. Sept. 27, 2002) (footnote omitted).

6

**STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) (citing *Williams*, 529 U.S. at 405-07), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively

7

unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority). If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. *See Lockhart*, 250 F.3d at 1232.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

## DISCUSSION

### I. Unexhausted Claim of Ineffective Assistance of Counsel

Petitioner claims she received ineffective assistance of counsel at trial due to defense counsel's failure to subpoena crucial witnesses. Because Petitioner failed to exhaust this claim, the Court declines to consider it. *See Rose v. Lundy*, 455 U.S. 509, 515-16 (1982).[1]

---

[1] Ordinarily, the Court would dismiss a petition containing both exhausted and unexhausted claims in its entirety, pursuant to *Rose v. Lundy*, and allow the petitioner the opportunity to exhaust the unexhausted claims or to amend the complaint to omit the unexhausted claim. Here, however,

8

## II. Insufficient Evidence

Petitioner claims there was insufficient evidence at trial to support her first degree felony murder conviction based on the underlying crime of torture, in violation of her right to due process. Specifically, Petitioner contends that the evidence was not sufficient to prove she had the requisite intent to commit the crime of torture.

California Penal Code section 206 provides that "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." Cal. Penal Code § 206 (West 2008). The jury found Petitioner guilty of first degree murder "in the perpetration of the act of torture." (Ex. 1 at 555.)

When Petitioner challenged the sufficiency of the evidence supporting her conviction on appeal at the state level, the California Court of Appeal reviewed "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." *Jeshurin*, 2002 WL 31160557 at \*5 (Cal. Ct. App. Sept. 27, 2002) (citing *People v. Johnson*, 26 Cal. 3d 557, 578 (1980)). Applying this standard, the California Court of Appeal concluded that the record contains substantial evidence that Petitioner intended to cause cruel or extreme pain for purposes of revenge, persuasion, or some other sadistic purpose. *Id.* at \*6-7.

### A. Legal Standard

---

Petitioner has already been given an opportunity to exhaust her ineffective assistance of counsel claim and she failed to do so within the time allowed by the Court. Therefore, her only option would be to amend the complaint to drop the ineffective assistance of counsel claim, at which point, the Court would proceed to address the exhausted claims on the merits. As the result would be the same either way, the Court does not deem it necessary to require Petitioner to go through the exercise of filing another amended petition, especially in light of the fact that Petitioner was specifically instructed, in the Court's Stay Order, that the Court intended to proceed to consider the merits of the exhausted claims if Petitioner failed to exhaust her ineffective assistance of counsel claim.

9

1    The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of her state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim. *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979). If the insufficiency of the evidence is proven, the prisoner is entitled to federal habeas relief. *See id.* at 324.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *See id.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.1985), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986), *and cert denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.1984), *cert. denied*, 469 U.S. 838 (1984).

On habeas review, a federal court evaluating the evidence under *In re Winship* and *Jackson* should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). However, mere suspicion and speculation cannot support logical inferences. *Id.*; *see, e.g.*, *Juan H. v. Allen*, 408 F.3d

10

1262, 1278-79 (9th Cir. 2005) (granting writ where, after resolving all conflicting factual inferences in favor of prosecution, only speculation supported petitioner's conviction for first degree murder under a theory of aiding and abetting).

After the Anti-Terrorism and Effective Death Penalty Act, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H.*, 408 F.3d at 1274. Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.* at 1275 (quoting 28 U.S.C. § 2254(d)). Section 2254(d)(1) plainly applies to *Jackson* cases; that is, if the state court affirms a conviction under *Jackson*, the federal court must decide whether the state court's application of *Jackson* was objectively unreasonable. *Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir. 2007). The Ninth Circuit has adopted the following guidelines for applying the "objective unreasonableness" test under section 2254(d)(1) to a state court decision applying *Jackson*:

(1) The focus of the inquiry is on the state court decision;

(2) Even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision;

(3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;

(4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and

(5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

*Id.* at 678 (citing *Hurtado v. Tucker*, 245 F.3d 7, 18 (1st Cir. 2001)).

By contrast, section 2254(d)(2) is not readily applicable to *Jackson* cases, because a court under *Jackson* makes no "determination of facts" in the ordinary sense of resolving factual disputes. *Id.* Rather, the court views the evidence in the light most favorable to the prosecution without resolving any disputed factual questions. *Id.* The federal court's task is not to decide whether the state court unreasonably determined disputed facts; it is to decide whether the state court

11

unreasonably applied the *Jackson* test. *Id.*; *see id.* at 683 (finding that while state court's characterization of certain testimony was objectively unreasonable, its conclusion that the *Jackson* standard was satisfied was not objectively unreasonable). Thus, a federal court evaluates a state court's resolution of a *Jackson* sufficiency of the evidence claim in all cases under section 2254(d)(1) rather than section 2254(d)(2). *Id.* at 2561-62.

**B.     Analysis**

The California Court of Appeal's rejection of Petitioner's claim that there was insufficient evidence adduced at trial showing that Petitioner had the requisite intent for the crime of torture, in violation of Petitioner's right to due process, was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

The California Court of Appeal correctly identified *Jackson* as the controlling Supreme Court precedent for evaluating evidentiary sufficiency. *Jeshurin*, 2002 WL 31160557, at *5. Applying *Jackson*, the appellate court found substantial evidence in the record for a rational trier of fact to find beyond a reasonable doubt that Petitioner had the intent to cause cruel or extreme pain. *Id.* at *6. The court's statement that intent can be established by circumstantial evidence such as the circumstances of the offense is consistent with federal law. *Id.* at *5 (citing *People v. Jung*, 71 Cal. App. 4th 1036, 1042-43 (1999)); *see Walters*, 45 F.3d at 1358. Based on the extent and severity of Fleck's injuries (fractured sternum, multiple fractured ribs, bumps on her head, a ligature mark around her neck, and "bruises on virtually every surface of [her] body"), the coroner testified that they were not accidental and would have required a significant amount of force. *Jeshurin*, 2002 WL 31160557, at *6. The coroner further concluded that the injuries were inflicted while Fleck was conscious and resisting and would have caused Fleck to cry out. *Id.* The condition of the victim's body and the coroner's testimony provided sufficient evidence upon which the jury could reasonably conclude that Petitioner intended to cause cruel or extreme pain.

The California Court of Appeal also identified sufficient evidence in the record to establish that Petitioner intended to inflict cruel or extreme pain and suffering on Fleck for the purpose of revenge, extortion, or for some other sadistic purpose. Noting that "[i]nflicting injury for the

12

purpose of controlling another's behavior satisfies the statute," the appellate court found Petitioner's admission of frustration with Fleck's helplessness and desire to "recondition[] her not to be lazy" provided sufficient evidence of the intent to injure Fleck for the purpose of controlling her behavior and persuading her to help herself. *Id.* (citing *People v. Healy*, 14 Cal. App. 4th 1137, 1141 (1993)). The appellate court also found that Petitioner's expressions of frustration with Fleck's "spoiled," "lazy," and "disgusting," behavior supported a finding that Petitioner had a sadistic intent to punish Fleck by causing her pain. *Id.* Although the evidence of Petitioner's intent was circumstantial, it went beyond "mere suspicion and speculation" and was sufficient to support a jury's logical inference that Petitioner intended to inflict cruel or extreme pain and suffering on Fleck for the purpose of revenge, persuasion, or for some other sadistic purpose. *Walters*, 45 F.3d at 1358; *see, e.g., Juan H.*, 408 F.3d at 1278-79.

In light of the guidelines for evaluating objective unreasonableness laid out in *Sarausad*, the state appellate court's analysis was a reasonable application of Supreme Court law. *Sarausad*, 479 F.3d at 678. The appellate court did not fail to consider Petitioner's arguments that she did not intend to hurt Fleck and that the injuries could have been accidental, but noted that "in light of the compelling evidence that defendant intentionally caused cruel or extreme pain by intentionally and repeatedly using force to injure Fleck, the jury was entitled to disbelieve defendant's self-serving statements." *Jeshurin*, 2002 WL 31160557, at *6 (citing *People v. Ochoa*, 6 Cal. 4th 1199, 1206 (1993) (exclusive province of jury to determine credibility of a witness and truth or falsity of the facts on which that determination depends)). Although Petitioner contends that the evidence can support a different conclusion, it was appropriate for the appellate court to "presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution" when weighing the evidence. *Jackson*, 443 U.S. at 326.

Petitioner is not entitled to federal habeas relief on her insufficient evidence claim because the California Court of Appeal's rejection of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

**III.     Trial Court's Instruction of the Jury**

13

Petitioner claims the jury instructions given at trial erroneously relieved the prosecution of its burden of proof of the requisite intent of torture by allowing the jury to convict her upon a legally invalid and unconstitutionally vague theory. Specifically, Petitioner contends that because the instructions did not inform the jury that the definition of the word "cruel" in the torture statute has been judicially narrowed to mean "extreme" or "severe," the jury could have convicted her based on the intent to cause "cruel" but not "extreme" pain and suffering. By allowing the jury to convict Petitioner based on the common definition of cruel rather than the legal definition, Petitioner claims the trial court violated her Sixth and Fourteenth Amendment rights.

The crime of torture requires the specific intent to cause "cruel or extreme pain and suffering." Cal. Penal Code § 206. The jury was instructed on the elements of torture pursuant to CALJIC No. 9.90 as follows:

> Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury upon the person of another, is guilty of the crime of torture in violation of section 206 of the Penal Code.
>
> "Great bodily injury" means a significant or substantial physical injury.
>
> The crime of torture does not require any proof that the perpetrator intended to kill the other person or the person upon whom the injury was inflicted suffered pain.
>
> In order to prove this crime, each of the following elements must be proved:
>
> 1. A person inflicted great bodily injury upon the person of another; and
>
> 2. The person inflicting the injury did so with specific intent to cause cruel or extreme pain or suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.

(Ex. 1 at 524; Ex. 2 at 371.) Based on the trial court's instructions, the jury found Petitioner guilty of torture.

When Petitioner challenged the correctness of the jury instructions on appeal at the state level, the California Court of Appeal considered "whether it is reasonably likely that the trial court's instructions caused the jury to misapply the law." *Jeshurin*, 2002 WL 31160557, at *8 (citing *Estelle v. McGuire*, 502 U.S. 62, 72 & n.4 (1991); *Boyde v. California*, 494 U.S. 370, 380 (1990)). Applying this standard of review, the California Court of Appeal concluded that "there is no

14

reasonable likelihood that the jury would have applied the term 'cruel' in a manner inconsistent with its legal definition." *Id.* at *9.

### A. Legal Standard

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle*, 502 U.S. at 71-72. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly, v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & n.4; *Boyde*, 494 U.S. at 380; *see, e.g., Ficklin v. Hatcher*, 177 F.3d 1147, 1150-51 (9th Cir. 1999) (harmless error when certain that jury did not rely on constitutionally infirm instruction). However, a determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings. *See Calderon*, 525 U.S. at 146-47; *see, e.g., Sarausad*, 479 F.3d at 679 (finding reasonable likelihood that jury applied ambiguous instruction on accomplice

15

liability to find defendant guilty of murder in a way that relieved the State of its burden of proof, and that this error was not harmless). A "substantial and injurious effect" has been construed to require "'a reasonable probability' that the jury would have reached a different verdict." *Clark v. Brown*, 450 F.3d 898, 916 (9th Cir. 2006) (quoting *Belmontes v. Brown*, 414 F.3d 1094, 1139 (9th Cir. 2005)). Whether a term in a jury instruction requires definition depends on whether the term expresses a concept within the jury's ordinary experience. *United States v. Tirouda*, 394 F.3d 683, 688 (9th Cir. 2005) (no error resulting from failure to define "accomplice" in an accomplice instruction).

When a jury delivers a general verdict that may rest on either a legally valid or legally invalid ground, the verdict may not stand when there is no way to determine its basis. *See Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir. 1999), *overruled on other grounds by Mancuso v. Olivarez*, 292 F.3d 939 (9th Cir. 2002). A conviction must be overturned if one of the theories that was submitted to the jury was legally erroneous because jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law. *See Keating*, 191 F.3d at 1062. Reversal is not required if it is absolutely certain that the jury relied upon the legally correct theory to convict the defendant, i.e., when the court determines that it was impossible for the jury to have relied on the infirm instruction. *See id.*; *see, e.g.*, *Lara v. Ryan*, 455 F.3d 1080, 1086-87 (9th Cir. 2006) (where jury given conflicting instructions on the mental state for attempted murder, jury specifically found that petitioner committed the murder attempts willfully, deliberately, and with premeditation, therefore it necessarily did not find that petitioner committed attempts recklessly under improper implied-malice theory).

The proper question in assessing harm in a habeas case is, "'Do I, the judge, think that the error substantially influenced the jury's decision?'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. *Id.* at 437. If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse. *Id.* In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or

16

1 influence in determining the jury's verdict, it must assume that the error is not harmless and the
2 petitioner must win. *Id.* at 436, 438.

### B.      Analysis

The California Court of Appeal's rejection of Petitioner's claim that the trial court's instruction of the jury erroneously allowed Petitioner to be convicted on a legally invalid and unconstitutionally vague theory was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* 20 U.S.C. § 2254(d)(1).

The California Court of Appeal is the highest state court to address the merits of Petitioner's claims in a reasoned decision, therefore this court looks to the analysis of the Court of Appeal in evaluating Petitioner's claims. *LaJoie*, 217 F.3d at 669 n.7. In deciding whether instructional error occurred, the appellate court correctly applied the *Estelle* standard by asking whether the trial court's instructions to the jury created a reasonable likelihood that the jury would misapply the law. *Jeshurin*, 2002 WL 31160557, at *8 (citing *Estelle*, 502 U.S. at 72). Noting that "[t]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification," *People v. Poggi*, 45 Cal. 3d 306, 327 (1988), the California Court of Appeal appropriately evaluated the disputed instruction "in the context of the instructions as a whole and the trial record," *Frady*, 456 U.S. at 169 (citing *Kibbe*, 431 U.S. at 154). *Jeshurin*, 2002 WL 31160557, at *8.

In response to Petitioner's claim that the judicial definition of "cruel" as "extreme" or "severe" created a legal definition of "cruel" that differs from its common definition, the Court of Appeal cited its previous holding that such a definition of cruel "comports with the common dictionary definition." *Id.* (citing *People v. Aguilar*, 58 Cal. App. 4th 1196, 1202 (1997) (citing WEBSTER'S NEW INTERNATIONAL DICTIONARY 546 (3d ed. 1965))); *see also People v. Barrera*, 14 Cal. App. 4th 1036, 1041 (1999) (terms used in describing the elements of torture in CALJIC 9.90, including "cruel or extreme pain and suffering," "are of such common usage that they are presumed to be within the understanding of reasonable jurors"). There is no need for a trial court to define a term that is "within the comprehension of the average juror." *Tirouda*, 394 F.3d at 689 (9th Cir.

17

2005) (citing *United States v. Dixon*, 201 F.3d 1223, 1231 (9th Cir. 2000)). The Court of Appeal concluded that "there is no reasonable likelihood that the jury would have applied the term 'cruel' in a manner inconsistent with its legal definition." *Jeshurin*, 2002 WL 31160557, at *9. Because the legal definition of "cruel" was not found to differ from its common definition, the state appellate court further found no merit in Petitioner's contention that the trial court was permitted the use of an unconstitutionally vague legal standard that relieved the prosecution of its burden of proof. *Id.*

Even if it was error for the trial court to fail to instruct the jury on the legal definition of "cruel," the error must have had a substantial or injurious effect or influence in determining the jury's verdict for federal collateral relief to be granted. *See Brecht*, 507 U.S. at 637; *see, e.g., Sarausad*, 479 F.3d at 679. Given the California Court of Appeal's dismissal of Petitioner's claim that the jury could have erroneously returned a guilty verdict based on an improper definition of "cruel," there is no "'reasonable probability' that the jury would have reached a different result" had the word "cruel" been defined. *Clark*, 450 F.3d at 916.

Petitioner is not entitled to federal habeas relief on her due process claim with regard to the trial court's instruction of the jury because the California Court of Appeal's rejection of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

**III. CONCLUSION**

After careful review of the record and pertinent law, the petition for writ of habeas corpus is denied. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

Dated: August 6, 2008

JEFFREY S. WHITE
United States District Judge

18

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JESHURIN,

        Plaintiff,

  v.

STATE OF CALIFORNIA et al,

        Defendant.

Case Number: CV03-01055 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 6, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jody Jeshurin
VSPW C3/03/02L
W-90202
P.O. Box 96
Chowchilla, CA 93610-0096

Dated: August 6, 2008

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk